**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

_____

|  |  |
|---|---|
| KATHRYN E. VAN VLECK )<br>1855 Saint Francis Street, Unit 103 )<br>Reston, Virginia  20190 )<br> )<br>     Plaintiff, )<br> )<br>        v. )<br> )<br>SALLYPORT GLOBAL HOLDINGS, INC. )<br>11921 Freedom Drive, Suite 1000 )<br>Reston, Virginia 20190 )<br> )<br>Serve:  Business Filings Incorporated )<br>       4701 Cox Road, Suite 285 )<br>       Glen Allen, Virginia  23060 )<br>       Registered Agent )<br> )<br>     and )<br> )<br>CALIBURN INTERNATIONAL, LLC )<br>10701 Parkridge Boulevard, Suite 200 )<br>Reston, Virginia  20191 )<br> )<br>Serve:  Commonwealth of Virginia )<br>       State Corporation Commission )<br>       1300 East Main Street )<br>       Tyler Building, 1st Floor )<br>       Richmond, Virginia 23219 )<br> )<br>     and )<br> )<br>JIM VAN DUSEN )<br>10701 Parkridge Boulevard, Suite 200 )<br>Reston, Virginia  20191 )<br> )<br>     and )<br> )<br>ROBERT RATHBUN )<br>11921 Freedom Drive, Suite 1000 )<br>Reston, Virginia 20190 )  | Civil Action No. _____<br><br>**COMPLAINT** |

and                            )
                                  )
SARITA CHAUHAN          )
11921 Freedom Drive, Suite 1000   )
Reston, Virginia 20190           )
                                  )
         Defendants.            )
_____ )

## COMPLAINT

COMES NOW THE PLAINTIFF, KATHRYN E. VAN VLECK, by counsel, and moves this Court for entry of judgment in her favor, and against the Defendants, SALLYPORT GLOBAL HOLDINGS, INC., CALIBURN INTERNATIONAL, LLC, JIM VAN DUSEN, ROBERT RATHBUN and SARITA CHAUHAN, jointly and severally, and in support of such motion alleges and avers as follows:

## NATURE OF ACTION

1.      This action states a claim of discrimination and hostile work environment based on gender (female) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended, and retaliation, including termination, in violation Title VII of the Civil Rights Act of 1964 after Plaintiff complained of illegal acts against her.

2.      This action also states common law claims for defamation and defamation *per se*, tortious interference with business expectancies, civil conspiracy and negligent retention of employees, as well as a claim of intentional infliction of emotional distress, against all Defendants.

## PARTIES

3.      Plaintiff Kathryn E. Van Vleck ("Ms. Van Vleck") is a resident and citizen of Fairfax County, in this judicial district and at all times relevant hereto, was employed by Sallyport Global Holdings, Inc. and Caliburn International, LLC (a subsidiary of Caliburn Holdings, LLC),

in this judicial district.  Ms. Van Vleck was an "employee" of Defendant Sallyport Global

Holdings, Inc. ("Sallyport") within the meaning of 42 U.S.C. § 2000e(f).  Sallyport became a

subsidiary company of Caliburn International, LLC in the second quarter of 2018.  Sallyport is a

foreign corporation in good standing in the Commonwealth of Virginia, maintains an agent for the

service of process in the Commonwealth of Virginia, and is headquartered in the Commonwealth

of Virginia, in this judicial district.

4.       Sallyport is engaged in an industry affecting commerce and has had more than 15

employees in each of twenty or more calendar weeks in the current or preceding year, within the

meaning of 42 U.S.C. § 2000e(b).  Sallyport is an "employer" within the meaning of 42 U.S.C.

§ 2000e(b).

5.       Sallyport has had more than 500 employees for each working day in each of

twenty or more calendar weeks in the current or preceding calendar year, within the meaning of

42 U.S.C. § 1981a(b)(3)(D).

6.       Defendant Caliburn International, LLC ("Caliburn") operates out of its

headquarters in the Commonwealth of Virginia, in this judicial district (Reston).  Caliburn does

not maintain an agent for the service of process in the Commonwealth of Virginia.

7.       Caliburn is engaged in an industry affecting commerce and has had more than 15

employees in each of twenty or more calendar weeks in the current or preceding year, within the

meaning of 42 U.S.C. § 2000e(b).  Caliburn is an "employer" within the meaning of 42 U.S.C.

§ 2000e(b).

8.       Caliburn has had more than 500 employees for each working day in each of

twenty or more calendar weeks in the current or preceding calendar year, within the meaning of

42 U.S.C. § 1981a(b)(3)(D).

9.      Defendant Jim Van Dusen ("Mr. Van Dusen") is a resident and citizen of Fairfax County, in the Commonwealth of Virginia, in this judicial district.

10.      For the majority of the events complained of herein, Mr. Van Dusen was (and is) the Chief Executive Officer, President, and Director of Caliburn, in this judicial district.

11.      Defendant Robert Rathbun ("Mr. Rathbun") is a resident and citizen of Fairfax County, in the Commonwealth of Virginia, in this judicial district.

12.      At all times relevant hereto, Mr. Rathbun was, and is, the General Counsel of Sallyport.

13.      Defendant Sarita Chauhan ("Ms. Chauhan") is a resident and citizen of Fairfax County, in the Commonwealth of Virginia, in this judicial district.

14.      At all times relevant hereto, Ms. Chauhan was, and is, the Director of Human Resources at Sallyport.

## JURISDICTION

15.      This Court has jurisdiction over Ms. Van Vleck's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

16.      This Court has jurisdiction over the subject matter of Ms. Van Vleck's claims under Title VII of the Civil Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-5(f).

17.      This Court has supplemental jurisdiction over Ms. Van Vleck's claims under the common law of Virginia, pursuant to 28 U.S.C. § 1367(a).

18.      The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

19.      The causes of action alleged in this action arose within the Eastern District of Virginia.

20.     Defendants are present in and regularly conduct business in this judicial district.

21.     Defendants are subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1(A)(1), (2) and (3).

## VENUE

22.     Defendants are present in and regularly conduct affairs and business activities in this judicial district.

23.     The causes of action alleged in this action arose in this judicial district.

24.     The unlawful employment practices committed by Defendants occurred in this judicial district, employment records relevant to such practices are maintained and administered in this judicial district, and Ms. Van Vleck would still be employed in this judicial district but for the unlawful employment practices of Defendants.

25.     Venue over Ms. Van Vleck's claims under Title VII is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3).

26.     Venue over Ms. Van Vleck's common law claims is proper in this Court pursuant to Va. Code § 8.01-262(1)(2)(3) & (4).

## PROCEDURAL STATUS

27.     Ms. Van Vleck timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on October 10, 2018.

28.     The EEOC issued a Right to Sue on October 18, 2018.

29.      All prerequisites to filing suit have been met, and this action is timely filed.

## BACKGROUND

30.     Caliburn was recently created by DC Capital Partners ("DC Capital") as a holding company to control four of DC Capital's companies:  Sallyport Global Holdings, Janus ESOP

Holdings, LLC ("Janus"), Comprehensive Health Services ("CHS"), and Project Time and Cost, LLC ("PT&C"). Each of these subsidiary companies are referred to on Caliburn's website as "a Caliburn company" (*i.e.*, "Sallyport Global Holdings – a Caliburn company").

31.     Ms. Van Vleck was the Vice President of Business Development and Marketing (and also responsible for Pricing) for Sallyport during the time of the majority of the events complained of herein. At the time of her termination, Ms. Van Vleck performed the job duties of Vice President of Technical and Professional Services (including her previous job duties of business development, marketing, and pricing), but never received an offer letter with the title change to Senior Vice President Technical and Professional Services or raise for this, despite being told it was a promotion.

32.     Sallyport provides contingency operation support services to support individuals and business enterprises primarily working in Iraq in the post-war environment.

33.     As Vice President of Business Development and Marketing at Sallyport, Ms. Van Vleck had four direct reports, and many of the functions across the organization cross matrix to Business Development. As Vice President of Technical and Professional Services (the position she held at the time of her termination), Ms. Van Vleck supervised over 150 employees in Technical and Professional Services, and she continued to be responsible for all of Business Development, pricing, significant pieces of finance, and was the Business Division lead for technical and professional services.

34.     Ms. Van Vleck worked extremely hard over the course of her career to earn the respect of her subordinates, peers, company leaders, and others across her industry.

35.     In the December 2017/January 2018 time frame, Ms. Van Vleck was given a $30,000 salary increase in recognition of her outstanding work performance, as well as a $25,000 year end bonus.

36.     In or around March 2018, Sallyport announced the hiring of a new General Counsel, Robert Rathbun.  On his first day of employment, when Ms. Van Vleck encountered Mr. Rathbun in the elevator, she asked if he had ever been employed at DynCorp (her previous employer), since his name sounded familiar to her.  Mr. Rathbun said he had never worked at DynCorp, and he claimed that Ms. Van Vleck must have him confused with his cousin, who he stated looks similar and has the same first and last name.

37.     A few days later, while in attendance at the company's monthly birthday cake party in the office, Mr. Rathbun admitted to Ms. Van Vleck that he had indeed been employed by DynCorp for a short time and that while there, he had been demoted from Legal to HR when Mr. Steve Gaffney became CEO of DynCorp.  Based on the dates, Ms. Van Vleck's and Mr. Rathbun's DynCorp employment overlapped for only a very short time.

38.     On or about April 11, 2018, Sallyport held a "going away" party for Kim Poole, SVP Global Mission Support, at Morton's Steakhouse in Reston Town Center.  Approximately 20 people attended.

39.     At the party, Ms. Van Vleck's then-direct supervisor, Matthew Stuckart ("Mr. Stuckart") (Sallyport COO at the time), pulled Ms. Van Vleck aside and told her that Mr. Rathbun had told him and Victor Esposito ("Mr. Esposito") (then CEO of Sallyport, now EVP of Caliburn) that Ms. Van Vleck was an alcoholic during the time she worked at DynCorp (from 2010-2015).

40.     Ms. Van Vleck was completely shocked and taken aback when she learned that Mr. Rathbun was spreading false information and defaming her, especially to her direct supervisor and the CEO.  Ms. Van Vleck was equally perplexed as to why Mr. Rathbun would make such a serious and unfounded accusation against her, when she had never worked with him.

41.     When Ms. Van Vleck voluntarily departed DynCorp, she held the position of Vice President of Business Development Operations and Strategy, and was also Special Assistant to the CEO.  There was never any incident at DynCorp for which Ms. Van Vleck was sanctioned, and she was never counseled for any performance issues.  To her knowledge, she did not come in contact with Mr. Rathbun at any time during her DynCorp employment.

42.     Mr. Van Dusen (CEO of Caliburn) later wrote in a letter addressed to Ms. Van Vleck that Mr. Rathbun did not call her an "alcoholic" but instead said "Bob told Victor that, in Bob's opinion, you appeared inebriated after work on a couple of occasions."  Mr. Rathbun's statement implies that Ms. Van Vleck was leaving work inebriated and was therefore intoxicated during work hours.  It also implies that Mr. Rathbun saw Ms. Van Vleck inebriated.

43.     Mr. Rathbun made this false and defamatory statement during a discussion regarding who should assume the new role of Chief Growth Officer at Sallyport – a role Ms. Van Vleck was interested in assuming.

44.     Because of the serious nature of the accusation, and her very serious concerns regarding the effect the dissemination of false information of that nature could have on her reputation and career, Ms. Van Vleck reported Mr. Rathbun's conduct to Sarita Chauhan ("Ms. Chauhan"), Sallyport's HR director and senior-most leader of HR.

45.     In mid- to late April, 2018, Steve Anderson ("Mr. Anderson") was hired as Sallyport's new Chief Growth Officer, becoming Ms. Van Vleck's new supervisor.  Upon his hire, Mr. Anderson told Ms. Van Vleck that he had heard of her "amazing" reputation before coming on board and was excited to be working with her.

46.     During this same time frame, Ms. Van Vleck was asked to run for the International Stability Operations Association ("ISOA") Board of Directors by the Chairman of ISOA, Greg Craddock.  When Mr. Esposito learned of this, Mr. Anderson informed Ms. Van Vleck that Mr. Esposito wanted Mr. Anderson to be on the ISOA Board instead of Ms. Van Vleck.  When Ms. Van Vleck explained that it was a personal nomination (*i.e.,* specific to her, and not a company nomination for Sallyport), Mr. Anderson responded that perhaps they could both be on the Board.

47.     Approximately a week after Ms. Van Vleck brought her concerns about Mr. Rathbun to HR, Ms. Chauhan asked Ms. Van Vleck to meet with two attorneys from Crowell & Moring – Trina Fairley Barlow ("Ms. Barlow") and Katie Erno ("Ms. Erno").  Ms. Chauhan told Ms. Van Vleck that Sallyport had engaged Crowell & Moring to investigate her complaints regarding Mr. Rathbun's defamatory comments.

48.     Ms. Barlow and Ms. Erno of Crowell & Moring, as representatives and agents for Sallyport, engaged in highly unprofessional conduct, including improperly interrogating Ms. Van Vleck about her personal life, and asked highly inappropriate and unprofessional questions.

49.     Ms. Van Vleck was asked what basis Mr. Rathbun had for his statement (none), or if she had ever been intoxicated at a DynCorp event (she had not).  Ms. Van Vleck told Ms. Barlow and Ms. Erno that the only explanation she could think of was that Mr. Rathbun had her

confused with someone else, since she had not been acquainted with him during her tenure at DynCorp.

50.     Shortly after the meeting with Ms. Barlow and Ms. Erno of Crowell & Moring, Ms. Van Vleck was informed that Ms. Barlow and Ms. Erno were asking employees about her personal life, habits, and appearance at work, and were asking employees if she was having sex with her subordinates.

51.     This conduct was hostile and retaliatory, and was engaged in at the direction of, and with the consent and support of Sallyport, Mr. Rathbun, and Ms. Chauhan.

52.     Ms. Van Vleck reported to Mr. Anderson (CGO of Sallyport) that she was being forced to work in a harassing and hostile environment, that her complaint was not being properly addressed or investigated, and that instead, the lawyers and Sallyport were engaging in hostile, harassing and retaliatory conduct towards Ms. Van Vleck.

53.     Mr. Anderson told Ms. Van Vleck that shortly after this, he contacted Mr. Esposito to try and cease the conduct against Ms. Van Vleck.  Mr. Anderson relayed to Ms. Van Vleck that Mr. Esposito (then Sallyport CEO) said he would not stop the investigation of Ms. Van Vleck, and stated that "sometimes people had problems," inferring that based on the defamatory statements of Mr. Rathbun, Ms. Van Vleck had "problems," and further evidenced that Crowell & Moring, Ms. Fairley Barlow and Ms. Erno were being directed and authorized to engage in discriminatory, hostile and retaliatory conduct towards Ms. Van Vleck by Sallyport.

54.     On Friday, May 4, 2018, Ms. Van Vleck went to the office and requested from Mr. Anderson to have the rest of the day off beginning at 10 a.m., which Mr. Anderson approved.  Ms. Van Vleck had worked until after midnight on the previous Wednesday fulfilling more than her required hours and also had to take her sick dog to the veterinarian on that Friday

morning.  After her visit to the veterinarian, Ms. Van Vleck went to lunch with Jeremy Rains ("Mr. Rains") and his wife, Hilary.  Mr. Rains was a Sallyport employee who, at the time, was a direct report of Ms. Van Vleck and also had the afternoon off after working excessive hours. Ms. Van Vleck was friends with Mr. Rains and his wife, Hilary, long before working at Sallyport.  The three sat outside at Jackson's Restaurant in Reston Town Center, where Jeremy Rains and Hilary Rains each had beer, and Ms. Van Vleck had wine with her lunch.

55.     During lunch, Mr. Rains told Ms. Van Vleck that Ms. Barlow and Ms. Erno of Crowell & Moring, while conducting the investigation on behalf of Sallyport, had asked him if he and Ms. Van Vleck were "having sex with each other," if Ms. Van Vleck had acted inappropriately or unprofessionally in the workplace, if she ever arrived at work "disheveled," and whether she dressed appropriately for work.

56.     Allegedly as part of the investigation they were conducting on behalf of and as agents of Sallyport, Ms. Barlow and Ms. Erno also asked Mr. Rains whether he had seen Ms. Van Vleck remove her undergarments.  Mr. Rains told Ms. Van Vleck that Ms. Barlow and Ms. Erno implied Ms. Van Vleck was having sex with men in public bathrooms.

57.     Ms. Van Vleck was extremely distraught to learn that her co-workers were being asked such inappropriate, humiliating and misleading questions by Ms. Barlow and Ms. Erno, who were supposed to be investigating her complaints relating to a narrow defamation complaint about Ms. Van Vleck being an alcoholic or inebriated while at DynCorp, but instead, were targeting her and spreading false and defamatory claims, innuendo, and inferences about her by virtue of the strong and serious implications created by the nature of the questions they posed, all in an attempt to discredit Ms. Van Vleck and ruin her impeccable reputation, and to protect Mr. Rathbun, and Sallyport.  Ms. Van Vleck left the lunch extremely upset and crying inconsolably.

58.     On Saturday, May 5, 2018, Ms. Van Vleck called Mr. Anderson to complain about the harassment and accusations being made against her, which were completely unjustified by her conduct, and which were discriminatory, and the result of, and in apparent retaliation for, her filing a complaint against Mr. Rathbun.  She expressed her serious concerns and distress at the direction the Sallyport investigation being conducted by Ms. Barlow and Ms. Erno had taken – that she was being investigated rather than Mr. Rathbun, and in a highly inappropriate, discriminatory, unethical, hostile and harassing manner – which she perceived as discriminatory and in retaliation for her complaining about Mr. Rathbun's conduct.

59.     Ms. Van Vleck was especially distraught due to the nature of the questions being asked about her to Sallyport leadership employees, as well as her subordinates, which aside from largely being unrelated to her complaint, completely undermined her authority and ability to effectively lead her team, and damaged her reputation and professionalism in the eyes of her peers, Sallyport leadership, and her direct reports.

60.     During the conversation, Mr. Anderson told Ms. Van Vleck that the previous day, Ms. Chauhan had stormed into his office with a photograph of Ms. Van Vleck, Mr. Rains and "another woman" on her phone, demanding to know Ms. Van Vleck's work hours.  Mr. Anderson immediately explained to Ms. Chauhan that Ms. Van Vleck had taken the afternoon of Friday, May 4 off from work, since she had already worked well over her 80 hours for the pay period, including working until midnight on Wednesday on a last minute request from Mr. Esposito.

61.     Therefore, while Ms. Van Vleck was having lunch with friends, on her afternoon off, someone took a photograph of Ms. Van Vleck and provided it to, at a minimum, Ms. Chauhan, as "proof" of Ms. Van Vleck's alleged alcoholism.  Taking the photograph was an

obvious invasion of Ms. Van Vleck's reasonable right to privacy, *on her afternoon off*.  In addition, however, whoever took the photograph had to have information concerning the investigation to be prompted to take the photograph and provide it to Ms. Chauhan, hoping to gather (*i.e.*, manufacture) "evidence" of Ms. Van Vleck acting in an inappropriate manner, none of which had anything to do with the defamatory statements and complaint relating to Ms. Van Vleck's conduct while at DynCorp.  Those actions indicate that the discriminatory, hostile, defamatory and damaging nature of the false allegations, given credence by Sallyport's engagement and direction of Crowell & Moring to investigate Ms. Van Vleck, rather than Mr. Rathbun, was apparently widely known, which created and fostered a discriminatory and hostile environment.

62.     In a letter, Jim Van Dusen (CEO of Caliburn), admitted that Ms. Chauhan was in possession of a picture secretly taken of Mr. Van Vleck, Mr. Rains, and Ms. Rains.

63.     The photograph of Ms. Van Vleck drinking wine at lunch on her day off was taken with the sole purpose of attempting to portray Ms. Van Vleck in a false light to her supervisor, and to her employer at large, and to manipulate evidence to bolster the defamatory "investigation" and to falsely support the "findings" to justify the direction of Sallyport's investigation being conducted by Ms. Barlow and Ms. Erno, which targeted Ms. Van Vleck, in a discriminatory and hostile manner, with falsely manufactured allegations, rather than Mr. Rathbun, the subject of the complaint.  Sallyport took these actions because of Ms. Van Vleck's gender, and in retaliation for Ms. Van Vleck's complaint against Mr. Rathbun.

64.     Mr. Anderson characterized the investigation (and photograph) as "ridiculous." Ms. Van Vleck explained that it was placing her in an extremely embarrassing and humiliating position, and that it was extremely defamatory and damaging to her both personally and

professionally.  Mr. Anderson told Ms. Van Vleck that she had always conducted herself in a professional manner, and that whoever took the photograph was "jealous" because Ms. Van Vleck is a smart, competent woman, and some people find that threatening, and often target women who are smart, competent, and confident in their business roles.

65.     Mr. Anderson also stated that he had heard of Ms. Van Vleck's "impeccable" reputation in the industry before he joined Sallyport and that he had been excited to be coming to work with her.  Mr. Anderson told Ms. Van Vleck that she has always exhibited "100% professionalism" and was doing an "exceptional" job.

66.     Rather than investigate Mr. Rathbun's conduct, however, Crowell & Moring's investigation, undertaken at Sallyport's direction through Ms. Barlow and Ms. Erno, was focused on destroying Ms. Van Vleck's professional and personal reputation, harassing Ms. Van Vleck, and creating a discriminatory, hostile and retaliatory work environment for Ms. Van Vleck.

67.     Crowell & Moring's investigation, undertaken at Sallyport's direction through Ms. Barlow and Ms. Erno, and the discrimination against Ms. Van Vleck, has irrevocably tarnished Ms. Van Vleck's reputation, damaged her career prospects, and caused her significant physical and emotional distress, while protecting the employee she had complained about.

68.     Furthermore, the lines of inquiry regarding Ms. Van Vleck's sex life pursued during the investigation performed on behalf of Sallyport were wholly unrelated to Ms. Van Vleck's complaint, baseless, discriminatory, and had no purpose other than to discredit Ms. Van Vleck following her complaint about the General Counsel, Mr. Rathbun, and to intentionally inflict emotional distress upon Ms. Van Vleck.

69.     As the investigation proceeded, it became apparent that Ms. Van Vleck was the one being targeted and "investigated," and not Mr. Rathbun, and that the investigation was not

appropriately undertaken to determine if Mr. Rathbun's statements about Ms. Van Vleck while at DynCorp were false.

70.     Ms. Van Vleck, and her colleagues and direct reports were interrogated about Ms. Van Vleck's drinking habits, appearance, professionalism, whether she had had sexual relations with subordinates (even asking Ms. Van Vleck's direct report if she was engaging in sexual relations with her employees), and if she had ever taken her undergarments off in a public place. This last question was coupled with the inference that Ms. Van Vleck took off her "undergarments" to have sex with men in public bathrooms.

71.     This conduct by Sallyport, and Ms. Barlow and Ms. Erno, was discriminatory based on Ms. Van Vleck's gender, served no legitimate purpose, and they had no right to ask these highly personal and defamatory questions in response to Ms. Van Vleck reporting Mr. Rathbun's conduct.

72.     Ms. Barlow's and Ms. Erno's investigation of Ms. Van Vleck, as representatives and agents of Sallyport, undertaken at the direction of Sallyport, and the nature of the questions posed to Ms. Van Vleck's colleagues, was further discriminatory, damaging and defamatory, because if those individuals had not yet heard the false statement made by Mr. Rathbun, they were certainly alerted to the nature of the accusations by the questions posed by Ms. Barlow and Ms. Erno, and the fact that an outside law firm had been retained to ask these questions added unfounded and false credence to the accusations made about Ms. Van Vleck, rather than Mr. Rathbun.

73.     Due to Sallyport's conduct, and the extremely defamatory, harassing, discriminatory, retaliatory, and unjustified nature of the investigation by Ms. Barlow and Ms. Erno, undertaken at the direction of and in concert with Sallyport, on May 6, 2018, Ms. Van

Vleck suffered an anxiety attack for which she had to be treated at urgent care.  Her heart was racing, she felt faint, and her blood pressure was alarmingly high.  Ms. Van Vleck was prescribed Paxil and Xanax to help relieve her symptoms caused by her anxiety.

74.     Ms. Van Vleck was embarrassed, humiliated, degraded, and horrified by the conduct of Ms. Barlow and Ms. Erno, and Sallyport, and nature of the questions her subordinates and co-workers were asked about her.  It became exceedingly difficult for Ms. Van Vleck to continue to move on and interact with her colleagues and team as if nothing had happened, knowing what they had heard about her, and wondering what they believed.

75.     In early May, 2018, another colleague, Steve Hartsuff ("Mr. Hartsuff"), VP of Global Mission Support, told Ms. Van Vleck that he was interrogated by Ms. Barlow and Ms. Erno regarding Ms. Van Vleck's drinking habits, and whether she was intoxicated at the going away party at Morton's Steakhouse (where most attendees had an alcoholic beverage).  They also asked Mr. Hartsuff whether Ms. Van Vleck arrived at work "disheveled" or acted in an unprofessional manner.  Mr. Hartsuff told Ms. Van Vleck that he was sorry they were doing this to her and that it was baseless.

76.     Following this, Ms. Van Vleck told Mr. Anderson (again) that she was extremely upset and distraught by how she was being treated, and that she should not be forced to work in such a hostile and harassing work environment, initiated by Mr. Rathbun and Ms. Chauhan due to her complaint against Mr. Rathbun, and strongly and publicly condoned and ratified by Sallyport as evidenced by the defamatory sham investigation against Ms. Van Vleck, instead of an investigation into her complaint against Mr. Rathbun, which involved defamatory statements about Mr. Rathbun allegedly witnessing Ms. Van Vleck at DynCorp.  Ms. Van Vleck further told Mr. Anderson that the "problem" she had (referring to Mr. Esposito's comment) was that she

was being harassed and defamed by the company's General Counsel and the highest ranking Human Resources employee at Sallyport.

77.     On May 11, 2018, by email to Ms. Chauhan (cc to Mr. Anderson), which was also sent to Ms. Barlow and Ms. Erno of Crowell & Moring, Ms. Van Vleck placed the company again on notice of the conduct, yet it continued to harass and investigate Ms. Van Vleck rather than addressing or investigating her concerns and complaints concerning Mr. Rathbun's conduct towards her.  Ms. Barlow responded by scheduling a meeting with Ms. Van Vleck at Sallyport for that afternoon.

78.     During the meeting on the afternoon of May 11, Ms. Barlow and Ms. Erno asked Ms. Van Vleck if she was engaged in a sexual relationship with any of her subordinate employees.  Ms. Barlow and Ms. Erno, conducting the investigation on behalf of and at the direction of Sallyport, treated Ms. Van Vleck in a hostile and disrespectful manner, stating that they have "full right to go where the investigation leads."  Ms. Barlow and Ms. Erno, as agents of Sallyport, retaliated against Ms. Van Vleck because of her complaints of the discriminatory and hostile conduct.  Ms. Van Vleck objected to the defamatory statements being made about her as part of the investigation, and that they had taken no steps to investigate Ms. Van Vleck's complaint against Mr. Rathbun, which related to his alleged observations of Ms. Van Vleck while at DynCorp.  Ms. Van Vleck also told Ms. Barlow and Ms. Erno about the photograph taken of her on her day off, provided to Ms. Chauhan, Ms. Chauhan's conduct, and Ms. Chauhan's distribution to her photograph in an attempt to defame Ms. Van Vleck with her direct supervisor and employer at large.

79.     That evening, while walking her dogs in the Reston Town Center, Ms. Van Vleck encountered Matthew Stuckart (her previous supervisor and Sallyport's previous COO), Ms.

Chauhan, and current Sallyport employee Steve Tidwell (Director of Security) sitting outside

drinking at Crafthouse, a restaurant/brewery.  When Ms. Van Vleck stopped to speak with Mr.

Stuckart, she observed that Ms. Chauhan appeared to be extremely intoxicated.  Ms. Chauhan did

not speak and had her head down near her glass.

80.     On or around May 14-16, 2018, Ms. Barlow, as an agent of Sallyport, contacted

Ms. Van Vleck to tell her the Sallyport investigation had been completed, the results of which

indicated that Ms. Van Vleck needed "someone in leadership to mentor" her.  When Ms. Van

Vleck protested, Ms. Barlow responded that it had already been agreed to, whether or not Ms.

Van Vleck agreed.  Ms, Barlow stated that the photograph was "allowed" and had been

considered as part of the "investigation" despite the fact that they had not known about it until

Ms. Van Vleck had told her about it on May 11.  This was all discriminatory and retaliatory and

highly inappropriate conduct.

81.     After that, Mr. Anderson informed Ms. Van Vleck that he would be her executive

mentor.  When Ms. Van Vleck objected and stated that she did not agree with the findings, Mr.

Anderson suggested they "just sweep this all under the rug."  Ms. Van Vleck vehemently

protested, stating that she would not "sweep this under the rug" after she had been humiliated,

defamed and degraded to her colleagues, and subordinates, discriminated against and retaliated

against, subjected to a hostile work environment, and suffered a major anxiety attack requiring

medical treatment as a result of the Defendants' conduct.  Mr. Anderson said he agreed with her,

told her she did not need a mentor, and that it was "B.S."

82.     As a result of this "investigation" conducted by Ms. Barlow and Ms. Erno, at

Sallyport's direction, Ms. Van Vleck was forced to defend herself against accusations of

excessive drinking, improper relations with subordinates, and the groundless "finding" that she required an executive mentor.

83.     Based on the results of the "investigation," Ms. Van Vleck was the only employee subjected to disciplinary action, while Mr. Rathbun and Ms. Chauhan were not disciplined or reprimanded.  In fact, Sallyport, Ms. Barlow and Ms. Erno, and Crowell & Moring, never investigated Ms. Van Vleck's complaint that Mr. Rathbun's statements about Ms. Van Vleck's conduct while at DynCorp were false, and instead used the complaint as a means to inflict significant harm upon Ms. Van Vleck.

84.     Ms. Chauhan's conduct was wholly ignored in the investigation, and false statements were made to cover up for Ms. Chauhan, including denying that a picture even existed, and condoning the behavior of Ms. Chauhan – Sallyport's Director of HR.  Ms. Chauhan created an even more hostile work environment for Ms. Van Vleck in retaliation for her complaints against Mr. Rathbun, in an attempt to manufacture evidence to bolster and justify Ms. Barlow's and Ms. Erno's "investigation" and "findings," and to support Sallyport's illegal course of conduct.

85.     The defamatory investigation by Ms. Barlow and Ms. Erno, of Crowell & Moring, undertaken at the behest and direction of Sallyport and as representatives and agents of Sallyport, and supported and ratified by Sallyport, resulted in discriminatory harassment, intense and unwarranted scrutiny, and lost career opportunities for Ms. Van Vleck.  She has also suffered severe physical and emotional distress, which has been medically documented.

86.     Ms. Van Vleck's ability to lead her team, and effectively coordinate and communicate with them, was severely undermined.  She could not help but feel that her co-workers were talking about her behind her back as a result of the false accusations, and the

inappropriate nature of the questions asked about her during the sham investigation. Even on her personal time, Ms. Van Vleck constantly looked over her shoulder to be sure she was not being photographed again, or her privacy invaded.

87.     Ms. Van Vleck's once "impeccable" reputation was irreparably damaged by Mr. Rathbun's outlandish and false accusation, which was demonstrably false, and which would have gone away immediately if proper and swift remedial action had been taken to clear up the lie. Instead, Sallyport engaged in a course of action that gave false, yet serious credence to the defamatory statement, by engaging Ms. Barlow and Ms. Erno to conduct an investigation with the purpose of attacking Ms. Van Vleck, and eliciting false "proof" and to manufacture evidence to somehow, in some twisted manner, "support" Mr. Rathbun's defamatory statement, even though his opportunity to observe Ms. Van Vleck and her conduct at DynCorp was never investigated, and instead, Crowell & Moring, Ms. Barlow and Ms. Erno, as agents of Sallyport, engaged in a vicious and malicious campaign to inflict defamatory, discriminatory, hostile, and harassing conduct on Ms. Van Vleck.

88.     But for the actions of Sallyport, Crowell & Moring, Ms. Barlow and Ms. Erno, the defamatory accusation would not have taken flight and been disseminated throughout Sallyport, Caliburn, and the industry.

89.     In the beginning of June 2018, Ms. Van Vleck complained to Jeff Morin ("Mr. Morin"), Sallyport Chief of Staff, that the conduct she had been subjected to, and continued to be subjected to, was egregious and damaging. She recounted the events in detail to Mr. Morin, in tears. She further stated she wanted to give Sallyport the chance to do the right thing and to conduct a proper and thorough investigation of the original complaint that Ms. Van Vleck had

made to Ms. Chauhan, and the ensuing conduct, including the stalking and secret picture taking that occurred as a result.

90.     Ms. Van Vleck was absent from the office on a previously scheduled vacation from June 23-30, 2018, hopeful that in her absence, appropriate action would be taken, or at least initiated.

91.     In June 2018, Mr. Anderson was released as Chief Growth Officer.  Ms. Van Vleck was never given an opportunity to apply for the position (either initially, in April of 2018, or in June of 2018), for which she was qualified.  Ms. Van Vleck was not considered for the position because of her gender, and because of the ramifications of Crowell & Moring, Ms. Barlow and Ms. Erno's discriminatory, harassing, defamatory and hostile investigation of her character, undertaken on behalf of and at the direction of Sallyport, and the false inferences, which were taken as true, made about her as a result of the investigation.

92.     Even after this, despite the hostile work environment, Ms. Van Vleck continued to work long hours and fulfill her job responsibilities for Sallyport.

93.     During this time, Sallyport was merging with Janus, CHS, and PT&C.  The CFO of CHS was Mr. Dusen, who ultimately became CEO of Caliburn, as Caliburn became the holding company of Sallyport, Janus, CHS, and PT&C.  He was appointed as CEO of Caliburn in July 2018, according to the Caliburn Form S-1, Registration Statement filed in October 2018.

94.     In July 2018, Ms. Van Vleck's role changed from VP of Business Development to VP for the Technical and Professional Services business division.  Although told it was a promotion, Ms. Van Vleck never received a formal offer letter, a title change to Senior Vice President, or salary increase – just the lateral change in title and additional work responsibilities to those she was performing as VP of Business Development and Marketing

95.     On August 17, 2018, Mr. Van Dusen, now CEO of Caliburn, and Bill King ("Mr. King"), Caliburn's General Counsel, requested to meet with Ms. Van Vleck in the executive conference room at Sallyport.  During the meeting, Mr. Van Dusen and Mr. King expressed shock over letters sent to Mr. Rathbun and Mr. Chauhan placing them on notice of Ms. Van Vleck's potential claims against them.  Ms. Van Vleck, on the other hand, expressed surprise at their "shock," telling them she had made countless reports and complaints to all levels of the organization, including giving Sallyport yet *another* chance to right the wrong, prior to leaving on her vacation in late June.

96.     Mr. Van Dusen and Mr. King asked Ms. Van Vleck to describe what had occurred, which she did, while in tears.  Mr. Van Dusen apologized and said they were "changing the culture" and this would not be tolerated anymore.  Ms. Van Vleck left the meeting hopeful.

97.     Upon Ms. Van Vleck's return from a previously scheduled vacation, on August 29, 2018, Mr. Van Dusen requested that she meet with him in Caliburn's offices, for the stated purpose of reviewing her business plan.  During the meeting, to which Ms. Van Vleck had been summoned under false pretense, Mr. Van Dusen informed Ms. Van Vleck that she had no place on the leadership team if she was going to be taking legal action against Ms. Chauhan and Mr. Rathbun, or Crowell & Moring, Ms. Barlow and Ms. Erno.  He further stated that while he had "felt sorry" for her during their last meeting, Ms. Van Vleck could not dictate the actions of the company by requesting the dismissal of Mr. Rathbun and Ms. Chauhan for their illegal conduct, or that the company cease offering them legal representation against her.   The suggestion of terminating Mr. Rathbun and Ms. Chauhan were made solely as settlement communications,

when the company requested a demand from Ms. Van Vleck, and were improperly addressed and weaved into Mr. Van Dusen's meeting with Ms. Van Vleck.

98.     At the end of the meeting, Mr. Van Dusen handed Ms. Van Vleck a letter.  In the letter, Mr. Van Dusen first congratulated her on her new position (the letter referenced her new position "at Caliburn"), and then abruptly transitioned to her request that Mr. Rathbun and Ms. Chauhan be terminated as a result of their illegal conduct, stating that "this has nothing to do with the legal claims you've raised."  The letter was in stark contrast to what Ms. Van Vleck had been told verbally (that she would be terminated if she did not drop her complaints).  Upon returning to the Sallyport offices, Ms. Van Vleck emailed Mr. Van Dusen to request clarification since the letter did not match the verbal conversation.

99.     Mr. Van Dusen then stated (in his letter) that the new job (and, therefore, Ms. Van Vleck's continued employment with Sallyport/Caliburn) was conditioned upon her agreement to drop her "unreasonable demands," (which were confidential settlement demands in the context of potential litigation, and engaging in protected activity) and to provide in an email, by close of business that day, confirmation that she was dropping her demand that Mr. Rathbun and Ms. Chauhan be terminated and that the company stop extending legal representation to them (which again demonstrated that the company was supporting them, and not Ms. Van Vleck).

100.    These requests by Caliburn and Mr. Van Dusen were illegal and retaliatory.

101.    On August 30 or 31, 2018, Ms. Van Vleck met with Mr. Van Dusen when he came to the Sallyport offices.  He wanted to know "where [her] head" was.  Ms. Van Vleck told Mr. Van Dusen that she would drop her request that Mr. Rathbun and Ms. Chauhan be terminated in exchange for Sallyport/Caliburn's promise to investigate her complaints, which had yet to be done.  Ms. Van Vleck also asked that the communication come from their attorneys

to hers, since the original communications had gone through the attorneys.  Ms. Van Vleck wanted the communication to go through the original and formal channels, so that there would be no miscommunications, or continuing efforts by Mr. Van Dusen to use confidential settlement communications to attempt to punish and retaliate further against Ms. Van Vleck.

102.    On September 14, 2018, Ms. Van Vleck received a follow up email from Mr. Van Dusen expressing his "disappointment" that she had not provided official notification that she was withdrawing her demands.  He said, "I thought we had agreed you would take care of this."

103.    To the contrary, Ms. Van Vleck had made it clear that any settlement discussions were to be conducted between counsel, and not mixed with her conditions of employment. Mr. Van Dusen then expressed further disappointment in Ms. Van Vleck's "inability to timely respond," and said, "I will be at your office at 4 pm today to meet face to face and I await your action."

104.    Ms. Van Vleck quickly responded to Mr. Van Dusen, pointing out that when they last spoke, "Sallyports [sic] attorney would be sending the path forward to my attorney to include that Caliburn [sic] would be investigating the complaints that I raised – and doing this investigation immediately."   As to the timeliness reprimand, Ms. Van Vleck explained that she had been working "an incredible amount of hours for Sallyport," and that "When I am told I will be fired if I do not drop my legal claims . . . it certainly gives me pause. . . ."

105.    Mr. Van Dusen responded, stating that he considered this an "internal matter" and expected a response from Ms. Van Vleck, and not her attorney.  This was highly improper and retaliatory, attempting to mix confidential settlement communications on claims that constituted protected activity.    In fact, the initial query regarding how to resolve the matter was made by Sallyport's counsel.  "Bu [sic] the close of business today, please advise whether you are

dropping your demands that Bob and Sarita be fired (or resign), and that the company stop extending representation to them."

106.    When Mr. Van Dusen arrived at 4 p.m. that day, the encounter was hostile, and in an elevated voice, he told Ms. Van Vleck that because he was the CEO, she should be doing as he said.  Ms. Van Vleck responded that she had simply requested that her complaints be investigated and that the communications go between attorneys.  Mr. Van Dusen screamed, "that is not what we agreed to" and continued screaming that he was losing his patience with her, threatening to place her on administrative leave immediately if she did not comply.

107.    Notably, neither Mr. Rathbun nor Ms. Chauhan were ever threatened with, or placed on, any type of leave as a result of their conduct.

108.    When Ms. Van Vleck did not provide confirmation that she was dropping her demands that day (and Sallyport did not provide the confirmation to her attorney that Caliburn would investigate her complaints), Ms. Van Vleck was placed on administrative leave, and Mr. Van Dusen escorted her from the building, while she was in tears, in the presence of co-workers, in a further attempt to humiliate and shame her at work, in retaliation for her complaints and request that the company take action to address and investigate the discriminatory and illegal conduct against her.  Mr. Van Dusen stated, "I'll expect a call from you this weekend," and further stated that he was walking her out "to be sure you are out of here."

109.    Caliburn and Sallyport took this action in retaliation for Ms. Van Vleck's refusal to drop her protected activity, including her complaints of illegal and discriminatory conduct.

110.    On September 18, 2018, Ms. Van Vleck received an emailed letter from Mr. Van Dusen (as CEO of Caliburn), on Caliburn letterhead, setting forth the requirements to be met by her in order to turn to work "and put this matter behind" her.  The letter was emailed to Ms. Van

Vleck by Sewit Mulat, the Administrative Assistant to Victor Esposito (formerly Sallyport CEO

and by that time the EVP of Caliburn), which further demonstrated that the matter had not been

kept confidential.

111.    The requirements that had to be met before Ms. Van Vleck would be allowed to

return to work were:

- Withdraw her demands that the company terminate Mr. Rathbun and Ms. Chauhan (or that they resign) and that the company cease extending legal representation to them [which were part of confidential settlement communications to resolve Ms. Van Vleck's complaints of discriminatory and retaliatory conduct and a hostile environment, all of which constituted protected activity];

- Immediately upon her return to work, give hand-written notes to Mr. Rathbun and Ms. Chauhan apologizing for insisting they leave the company, and stating to each, separately, that she wishes to repair her working relationship with them. Although they were also supposed to apologize to her, Mr. Van Dusen made it clear that Ms. Van Vleck must do so in order to return to work, whether or not they did, and if they did not apologize on their end, there would be no consequences. [This was highly retaliatory and discriminatory and was asking a victim of discrimination and retaliation to "apologize" to the bad actors who engaged in illegal and outrageous conduct against her]

- Ms. Van Vleck had to state in writing her "understanding" that the company is not *requiring* her to withdraw any legal claims she may have against Mr. Rathbun, Ms. Chauhan or the company [which was false in light of the above, and other evidence]; and

- Ms. Van Vleck had to state that she was not imposing any obligations on the company to take any action or resolve any issues of any nature in order for her to comply with the above requests.

112.    Mr. Van Dusen further stated, "If you comply with this request, we will welcome

you back to work immediately and unconditionally. . . . If you fail to comply fully with this

request, we will end your employment immediately and you will be paid through September 21,

2018."  This was illegal and retaliatory.

113.    Mr. Van Dusen went on to state the "evidence we have gathered" so that Ms. Van Vleck would "understand the scope of their respective apologies."  While he mandated that Ms. Van Vleck "apologize unconditionally," Mr. Rathbun and Ms. Chauhan did not have to do the same, and he went to great lengths to justify their actions and, therefore, minimize their "apology" since the company had no "first hand knowledge" to substantiate Ms. Van Vleck's complaints, and he was "confident that Bob never intended to offend you – or adversely affect you in any way at the company – by sharing his opinion" that Ms. Van Vleck "appeared inebriated after work on a couple of occasions" while working at DynCorp.

114.    Ms. Chauhan's apology was merely to state that "she did not intend to create any negative inferences about you in any way, and to apologize if she inadvertently did so."

115.    Mr. Van Dusen also alleged that "[t]o date, [Ms. Van Vleck has] not voiced an internal complaint regarding harassment or a hostile work environment," and directed that if Mr. Rathbun or Ms. Chauhan engaged in any conduct *not covered in this letter* that created a hostile work environment, Ms. Van Vleck should detail the conduct "so we can initiate an investigation under our harassment policy."

116.    The allegation that Ms. Van Vleck did not voice a complaint regarding harassment or a hostile work environment was completely false.  In addition, Mr. Van Dusen's statement was retaliatory, illegal, and inappropriate.

117.    On September 21, 2018, Ms. Van Vleck responded to Mr. Van Dusen's letter. The response pointed out that Mr. Van Dusen's request that Ms. Van Vleck drop her legal claims in order to return to work was retaliation in its purest form, and questioned why Ms. Van Vleck would apologize to her harassers.

118.     The response also questioned why Mr. Rathbun and Ms. Chauhan would be apologizing to her if they did nothing wrong – the position taken by Sallyport and Caliburn.  The company had asked what Ms. Van Vleck wanted, she responded through the correct confidential settlement communication chain, which Mr. Van Dusen and Caliburn did not honor, and now she was being forced to retract her requests and apologize for responding to the company's request for a settlement demand because they did not agree with the request.

119.     The response also pointed out that Mr. Van Dusen's statement that Ms. Van Vleck had not voiced an internal complaint about harassment was false, since this was clearly communicated on multiple occasions, and the company was attempting to justify its inaction and failure to investigate purportedly because the complaint had not come directly from Ms. Van Vleck.

120.     In fact, Ms. Van Vleck complained directly, on multiple occasions, including to Steven Anderson (CGO), Jeff Morin (Chief of Staff), Jim Van Dusen (CEO of Caliburn), and Bill King, (General Counsel of Caliburn) on multiple occasions from April 2018 through August 2018.  She was in tears on multiple occasions as she had to describe what had occurred and the medical attention she had to receive  In June 2018, Ms. Van Vleck told Mr. Morin she was giving Sallyport the another opportunity to do the right thing and follow up and investigate her complaints.  She further told him that she had to work in a hostile work environment with the two individuals who harassed her.  Ms. Van Vleck's complaints were also set forth in her email to HR and to Ms. Barlow and Ms. Erno on May 11.  Additionally, on multiple occasions, Ms. Van Vleck spoke with Mr. Anderson about the hostile and harassing work environment and conditions she was being forced to work under given the actions of Mr. Rathbun, Ms. Chauhan, Ms. Barlow, and Ms. Erno.  On August 17, Ms. Van Vleck also informed Mr. Van Dusen, CEO

of Caliburn, and Mr. Bill King, General Counsel of Caliburn, of the hostile and harassing work environment and severe distress she was undergoing as a result of the actions of Mr. Rathbun, Ms. Chauhan, Ms. Erno, and Ms. Barlow.

121.    On September 21, 2018, Ms. Van Vleck received an email from Mr. Van Dusen terminating her employment "for the reasons set forth in [his] letter dated September 18, 2018" – *i.e.,* Ms. Van Vleck's refusal to apologize to her harassers – the individuals whose illegal conduct instigated the events that have irreparably damaged her reputation and career, and caused her to suffer distress.

122.    Ms. Van Vleck was replaced by a male, who was not already an employee of Sallyport or Caliburn, in a week's time, and he received the title promotion that she was never given – that of Senior Vice President of Technical and Professional Services.  But earlier, when Ms. Van Vleck was made to take on all of the duties of that position while continuing those of her previous position, she was never actually given an official offer letter, change in title (that from VP to SVP), or raise.

123.    Notably, the Sallyport website announced that the male who replaced Ms. Van Vleck started his employment on October 1, 2018 – just over a week after she was terminated. The typical time required to interview and hire an external candidate in this industry, and at this level, is approximately six to eight weeks.  Therefore, Sallyport and Caliburn had obviously conducted the interview process and background checks prior to Ms. Van Vleck's termination, and in anticipation of her termination.

**COUNT ONE –**
**DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**
**IN THE COURSE OF EMPLOYMENT IN VIOLATION OF TITLE VII**
**(against Sallyport Global Holdings, Inc.)**

124.    The allegations of the foregoing paragraphs are incorporated as if re-alleged

herein.

125.    Sallyport, through its agents, officers and employees, discriminated against Ms.

Van Vleck and subjected her to a hostile work environment based on her gender, as set forth in

greater detail above.  This discrimination was with respect to the terms, conditions, and

privileges of Ms. Van Vleck's employment.

126.    Specifically, when Ms. Van Vleck informed her supervisor, Mr. Anderson, that

she had been asked to run for the ISOA Board of Directors by the Chairman of ISOA, Mr.

Anderson told Mr. Esposito.  When Mr. Esposito learned of this, Mr. Anderson informed Ms.

Van Vleck that Mr. Esposito wanted Mr. Anderson to be on the ISOA Board instead of Ms. Van

Vleck.  When Ms. Van Vleck explained that it was personal nomination (*i.e.,* specific to her, and

not a company nomination for Sallyport), Mr. Anderson responded that perhaps they could both

be on the Board.  Mr. Esposito wanted Mr. Anderson, a male, to be on the ISOA Board as the

face of Sallyport instead of a female, Ms. Van Vleck.

127.    Ms. Van Vleck was also not considered for the role of Chief Growth Officer

despite being fully qualified, and that role was filled by a male employee, Steve Anderson, who

became Ms. Van Vleck's supervisor until he was involuntarily separated from his employment.

Nor was Ms. Van Vleck given an opportunity to apply for the role of Chief Growth Officer after

Mr. Anderson's termination.  The role was again filled by a male.

128.    In addition, in July 2018, when Ms. Van Vleck's role changed from VP of

Business Development to VP of Operations for Technical and Professional Services, she was

told it was a promotion, but never received a formal offer letter, the title change to Senior Vice President, or a salary increase – just the lateral change in title and additional work responsibilities.  In sharp contrast, the male employee who replaced Ms. Van Vleck after her termination and within a week's time, received the title promotion to Senior Vice President that she was never given.

129.    Following her Complaint that Mr. Rathbun knowingly defamed her by calling her an alcoholic, Sallyport subjected Ms. Van Vleck to a months-long "investigation" with the purpose of humiliating, demeaning, and destroying Ms. Van Vleck's professional and personal reputation.  Under the guise of this "investigation" Ms. Van Vleck's coworkers were asked about her drinking habits, sexual conduct, and appearance, and the investigators implied that Ms. Van Vleck was an alcoholic, had sex with subordinates, had sex with men in public bathrooms, drank on the job, and was generally unprofessional.  These insinuations, and Sallyport's refusal to retract or otherwise dispute them, made every interaction with Ms. Van Vleck and her coworkers embarrassing, painful, and anxiety-producing.  Ms. Van Vleck suffered an anxiety attack as a direct result of this "investigation" and Sallyport's tacit support of these insinuations.

130.    Sallyport's attempts to assassinate Ms. Van Vleck's reputation were grounded in sex, as demonstrated by Ms. Barlow's and Ms. Erno's intent to find sexual misconduct by Ms. Van Vleck where there was none.  The sex-based nature of these attacks is also demonstrated by Ms. Chauhan's attempt to "prove" that Ms. Van Vleck was having sexual relations with subordinates through a picture that actually showed Ms. Van Vleck having lunch with a coworker and his wife.

131.    In addition, the fact that the Sallyport website announced that the male who replaced Ms. Van Vleck started his employment on October 1, 2018 – just over a week after she

31

was terminated – demonstrated that Sallyport and Caliburn conducted the entire interview process and background checks prior to Ms. Van Vleck's termination, and in anticipation of her termination, which was the plan the entire time.

132.    Sallyport's discriminatory treatment of Ms. Van Vleck violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

133.    In discriminating against Ms. Van Vleck in violation of federal law, Sallyport evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Van Vleck.

134.    Sallyport engaged in these practices with malice and with reckless indifference to the federally protected rights of Ms. Van Vleck, within the meaning of 42 U.S.C. § 1981a(b)(1).

135.    As a direct and proximate result of Defendant's actions, Ms. Van Vleck has suffered, and will in the future suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, stress, panic attack, embarrassment, humiliation, stomach pains, insomnia, headaches, exhaustion, depression, anxiety, a sense of betrayal, isolation and profound injustice, damage to her reputation, fearfulness, loss of enjoyment of life, medical expenses, physical impact, loss of career and business opportunities and advancement, other past pecuniary expenses, future pecuniary losses, and other non pecuniary losses.

136.    Due to the conscious disregard for Ms. Van Vleck's federally protected rights, and the severity of Defendant's conduct, Ms. Van Vleck is also entitled to, and requests, punitive damages.

**COUNT TWO –**
**RETALIATION AND RETALIATORY**
**TERMINATION IN VIOLATION OF TITLE VII**
**(against Sallyport Global Holdings, Inc. and Caliburn International, LLC)**

137.    The allegations of the foregoing paragraphs are incorporated as if re-alleged

herein.

138.    Sallyport and Caliburn, through its agents (including Ms. Barlow and Ms. Erno),

officers and employees, retaliated against Ms. Van Vleck and subjected her to a hostile work

environment after she filed a complaint about the General Counsel, Mr. Rathbun, and Ms.

Chauhan, the Director of Human Resources at Sallyport.  This retaliation was with respect to the

terms, conditions, and privileges of Ms. Van Vleck's employment.

139.    Rather than taking steps to investigate Ms. Van Vleck's complaint about Mr.

Rathbun for spreading false, damaging and defamatory statements about her to Ms. Van Vleck's

then-supervisor and others, Sallyport and Caliburn retaliated by engaging in a course of conduct

designed to discredit Ms. Van Vleck in her employment, and to protect the male employee she

complained about.

140.    Sallyport and Caliburn refused to investigate Ms. Van Vleck's serious and well-

founded complaint against Mr. Rathbun for making extremely damaging and defamatory

statements about her (whose statements against Ms. Van Vleck were verified by Ms. Van

Vleck's own supervisor and others) and instead, protected Mr. Rathbun by engaging Ms.

Barlow and Ms. Erno of Crowell & Moring to conduct an unjustified investigation into Ms. Van

Vleck's personal life, inexplicably triggered by her reporting Mr. Rathbun's defamatory

conduct towards her to Sallyport HR.

141.    The nature of the majority of the questions posed during the investigation had to

do with Ms. Van Vleck's sex life – whether she engaged in inappropriate sexual relations with

her subordinates, whether she came to work "disheveled," whether she dressed inappropriately (*i.e.,* provocatively) at work, whether she had ever removed her undergarments to have sex with men in public bathrooms, and if she acted in an inappropriate manner in the workplace.  This line of questioning had absolutely no bearing on Ms. Van Vleck's complaint about the conduct of Mr. Rathbun and instead, was designed to harass, discredit, humiliate and embarrass Ms. Van Vleck, and to make it impossible for her to effectively lead her team.

142.    Sallyport and Caliburn also attempted to use a photograph taken of Ms. Van Vleck without her knowledge or consent, having a glass of wine with friends on her day off, as proof of her having an affair with a subordinate, skipping work, and allegedly having a drinking problem.

143.    Ms. Van Vleck complained directly, on multiple occasions, about these acts of hostile work environment and gender discrimination, to her supervisors, including to Steven Anderson (CGO), Jeff Morin (Chief of Staff), Jim Van Dusen (CEO of Caliburn), and Bill King, (General Counsel of Caliburn) on multiple occasions from April 2018 through August 2018.

144.    In retaliation for making these complaints, Sallyport and Caliburn subjected Ms. Van Vleck to an adverse employment action (mandatory executive mentoring) while taking no adverse action against the offenders; not affording Ms. Van Vleck a chance to be considered for the Chief Growth Officer position (when the position was first created or after Mr. Anderson was released) as a result of the defamatory investigation against her and the ensuing effect on her reputation, leadership and professionalism; placing Ms. Van Vleck on administrative leave unless she agreed not to pursue legal action; attempting to force Ms. Van Vleck to provide written apologies to her harassers as a condition of returning to work while not requiring the same of them; attempting to use confidential settlement communications to force Ms. Van Vleck

to drop her settlement request that Mr. Rathbun and Ms. Chauhan be terminated for their illegal conduct; attempting to force Ms. Van Vleck to drop her legal claims in order to remain employed; placing Ms. Van Vleck on administrative leave and escorting her out of the building in tears in front of her co-workers, giving the impression that she had engaged in conduct egregious enough to warrant an escort for the building; and ultimately, terminating Ms. Van Vleck's employment

145.     Defendants' discriminatory treatment of Ms. Van Vleck violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

146.     In retaliating against Ms. Van Vleck in violation of federal law, Defendants evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Van Vleck.

147.     Defendants engaged in these practices with malice and with reckless indifference to the federally protected rights of Ms. Van Vleck, within the meaning of 42 U.S.C. § 1981a(b)(1).

148.     As a direct and proximate result of Defendants' actions, Ms. Van Vleck has suffered, and will in the future suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, stress, panic attack, embarrassment, humiliation, stomach pains, insomnia, headaches, exhaustion, depression, anxiety, a sense of betrayal, isolation and profound injustice, damage to her reputation, fearfulness, loss of enjoyment of life, medical expenses, physical impact, loss of career and business opportunities and advancement, other past pecuniary expenses, future pecuniary losses, and other non pecuniary losses.

149.     Due to the conscious disregard for Ms. Van Vleck's federally protected rights, and the severity of Defendants' conduct, Ms. Van Vleck is also entitled to punitive damages.

**COUNT THREE –**
**DEFAMATION AND DEFAMATION *PER SE***
**(against Sallyport Global Holdings, Inc., Robert Rathbun and Sarita Chauhan)**

150.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

151.     Robert Rathbun, Sarita Chauhan and Sallyport (through the investigation conducted by Ms. Barlow and Ms. Erno of Crowell & Moring at the direction of Sallyport) made false and defamatory statements, and engaged in conduct that amounted to defamation, to employees of Sallyport.

152.     Mr. Rathbun and Ms. Chauhan are also individually liable for these statements, acting both within and outside the scope of their employment and positions with Sallyport.

153.     The defamation included the conduct described in paragraphs ¶¶ 39, 42-43, 48-51, 53, 55-57, 59-63, 66-72, 75, 78, 82 and 84-85.

154.     The statements and conduct, set forth in paragraphs ¶¶ 39, 42-43, 48-51, 53, 55-57, 59-63, 66-72, 75, 78, 82 and 84-85 concerning Ms. Van Vleck were false and used language which, when taken as a whole, implied, insinuated and/or inferred that Ms. Van Vleck was incompetent, dishonest, unethical in the performance of her job responsibilities and duties, or that she lacked integrity and trustworthiness.

155.     Defendants' statements and conduct constituted defamation and defamation *per se*.

156.     Defendants' statements and conduct asserted falsely or used language which, when taken as a whole, implied, insinuated and/or inferred that Ms. Van Vleck was incompetent,

dishonest, unethical in the performance of her job responsibilities and duties, and that she lacked integrity in the performance of her work and in her personal life, and the effect of Defendants' words and actions was prejudicial to Ms. Van Vleck in her work, her career, and even in her personal life.

157.    Defendants knew these statements and actions were false and intentionally portrayed Ms. Van Vleck in a false and defamatory light, and/or made these statements and engaged in this conduct with reckless disregard as to whether the statements or conduct were false; the statements or conduct were unnecessarily insulting; the language or actions used were stronger or more violent than was necessary under the circumstances; and/or Defendants made the defamatory statements and engaged in defamatory conduct because of hatred, ill will or a desire to injure Ms. Van Vleck, rather than a fair comment on the subject.

158.    Defendants' statements and conduct regarding Ms. Van Vleck as set forth in ¶¶ 39, 42-43, 48-51, 53, 55-57, 59-63, 66-72, 75, 78, 82 and 84-85 were disseminated to Sallyport and Caliburn employees, both at the time they were made, and throughout the course of the entire "investigation" undertaken by Ms. Barlow and Ms. Erno, acting as agents of, at the behest of, and at the direction of Sallyport.

159.    Defendants, by their actions prior to, during, and subsequent to the statements being made, authorized and ratified the statements through continuing actions to attempt to create a record supporting the false and defamatory statements, including but not limited to, engaging in conduct designed to embarrass and portray Ms. Van Vleck in a false and unfairly negative light (in particularly by intentionally and purposefully disseminating the statements to multiple employees during the course of the unjustified "investigation"), and when taken as a whole, implied, insinuated and/or inferred that Ms. Van Vleck was incompetent, dishonest, and

unethical in the performance of her job responsibilities and duties, and suggest Ms. Van Vleck lacked integrity.

160.    Such comments and actions served to permanently damage Ms. Van Vleck's reputation in the eyes of her subordinates and colleagues, and others in the profession and to prevent Ms. Van Vleck from obtaining other employment.

161.    Such comments and action also served to damage Ms. Van Vleck's personal reputation by suggesting that Ms. Van Vleck was an alcoholic, engaged in sexual misconduct, and irresponsible.

162.    There was no factual information to support the defamatory statements and Defendants knew them to be false.

163.    These materially false and misleading statements were made with the intent to harm, and did harm, Ms. Van Vleck's reputation, integrity and competency in her employment and profession.

164.    Such comments and actions served to permanently damage Ms. Van Vleck's reputation in the eyes of employees and colleagues, and related business communities.

165.    The statements made and conduct by Defendants also asserts that Ms. Van Vleck was unfit to perform the duties of her employment.  The effect of these statements was prejudicial to Ms. Van Vleck in her reputation and her work, her ability to find other work, and severely undermined her ability to lead her team, interact with her colleagues, and be taken seriously as a professional at work, knowing her co-workers have heard the false and defamatory statements and were likely discussing it amongst themselves.  Defendants repeated these defamatory statements to multiple third parties (employees of Sallyport), and they were disseminated to the highest level of Caliburn leadership.

166.    The statements have had the further and far reaching effect of making it extremely difficult for Ms. Van Vleck to seek new employment in her industry, not knowing how far the rumors have circulated, unabated.

167.    Defendants' conduct and statements constituted defamation and defamation *per se*.

168.    Defendants' statements and conduct assert that Ms. Van Vleck is unfit to perform the duties of her employment, and that she lacked integrity in her profession.  The effect of Defendants' words was prejudicial to Ms. Van Vleck in her professional reputation.  Any privilege connected to these statements was waived because (a) Defendants knew these statements were false or made these statements with reckless disregard as to whether the statements were false or not; (b) the statements were deliberately made in such a way that they were heard by persons having no interest or duty in the subject of the statement; (c) the statements were unnecessarily insulting; (d) the language used was stronger or more violent than was necessary under the circumstances; (e) Defendants made the statements because of ill will or a desire to injure Ms. Van Vleck, rather than a fair comment on the subject; and/or (f) the statements were made because of personal spite, or ill will, independent of the occasion on which the communication was made.

169.    Any privilege connected to these statements is overcome by Defendants' malice in making these statements for personal motive of ill-will, sprite, hostility, vengeance, or a deliberate intent to harm Ms. Van Vleck, and the statements were made with the malicious intent to discredit Ms. Van Vleck professionally and personally, to prevent Ms. Van Vleck from obtaining further employment, and to cast doubt on Ms. Van Vleck's integrity and character.

170.     Such comments and actions served to permanently damage Ms. Van Vleck's reputation in the eyes of the industry where she built her career.  Prior to this, as characterized by her direct supervisor, Mr. Anderson, her reputation had been "impeccable."

171.     The conduct of Defendants was malicious, wanton, spiteful and evinced a willful and conscious disregard for Ms. Van Vleck's rights and reputation, perpetuated and condoned by the highest leaders of Sallyport and Caliburn and further was accomplished in a reckless and grossly negligent manner.

172.     As a direct and proximate result of Defendants' actions, Ms. Van Vleck has suffered, and will in the future suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, stress, panic attack, embarrassment, humiliation, stomach pains, insomnia, headaches, exhaustion, depression, anxiety, a sense of betrayal, isolation and profound injustice, damage to her reputation, fearfulness, loss of enjoyment of life, medical expenses, physical impact, loss of career and business opportunities and advancement, other past pecuniary expenses, future pecuniary losses, and other non pecuniary losses.

173.     Mr. Rathbun and Ms. Chauhan were acting both within and outside the scope of their employment through the use of improper and unlawful means and were acting to serve and advance their own interests, both personal and financial.

174.     Mr. Rathbun was acting outside the scope of his employment and was acting to serve his own interests in defaming Ms. Van Vleck because he was humiliated by his demotion from the legal staff to the HR staff at DynCorp and ultimate departure from DynCorp and the circumstances, where Ms. Van Vleck also worked, and he was concerned that Ms. Van Vleck would discuss his demotion and departure with others at Sallyport.  As a result, Mr. Rathbun

sought to discredit Ms. Van Vleck at Sallyport and to protect his own career by defaming her with statements including that she was an alcoholic and had appeared inebriated after work on several occasions, in an attempt to have Ms. Van Vleck terminated.

175.    Ms. Chauhan was acting outside the scope of her employment and was acting to serve her own interests and to protect her own employment and career in defaming and discrediting Ms. Van Vleck because Ms. Chauhan sought to cover up her own role in supporting, encouraging and condoning Crowell & Moring, Ms. Barlow and Ms. Erno's illegal and improper "investigation" (directed by and condoned by Sallyport) that created an even more gender hostile work environment for Ms. Van Vleck and in retaliation for her complaints against Mr. Rathbun.

176.    At any time to the extent the individual defendants were or contend they were acting as an agent of their employer, they were acting outside the scope of that agency and not acting in the best interests of Sallyport or Caliburn.

177.    Defendants engaged in this conduct with malice, ill-will, spite and evinced a conscious disregard for the rights of Ms. Van Vleck.

178.    Due to the severity of Defendants' willful misconduct and malice, Ms. Van Vleck is also entitled to and requests punitive damages.

**COUNT FOUR -**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES**
**(against Robert Rathbun, Jim Van Dusen and Sarita Chauhan)**

179.    The foregoing allegations are incorporated as if realleged herein.

180.    Ms. Van Vleck was enjoying a promising career at Sallyport and Caliburn (and had been congratulated by Mr. Van Dusen for her new position at Caliburn), as evidenced by her performance and commitment to her job, and, prior to the events complained of herein, her well-earned, impeccable reputation in the industry.

181.     During all times relevant hereto, Ms. Van Vleck performed her job duties in an exemplary manner.

182.     As part of Ms. Van Vleck's employment with Sallyport and Caliburn, Ms. Van Vleck possessed business expectancy with Sallyport and Caliburn of continued career advancement and opportunity, particularly in light of her achievements of bringing in contracts for the company, which were desperately needed and had not been earlier obtained.

183.     Mr. Rathbun, Ms. Chauhan, and Mr. Van Dusen were each aware of Ms. Van Vleck's business expectancies of continued employment, and the attendant compensation and benefits, with Sallyport and Caliburn, and while acting outside the scope of their employment, employed improper means to interfere with Ms. Van Vleck's contractual relations and business expectancies with Sallyport and Caliburn.

184.     Mr. Rathbun, Ms. Chauhan, and Mr. Van Dusen engaged in a continuous course of conduct to discredit, harass, punish, and effect the termination of Ms. Van Vleck for complaining against Mr. Rathbun and demanding that her complaint be investigated and effective remedial action be taken against him.

185.     Mr. Rathbun, Ms. Chauhan and Mr. Van Dusen employed improper methods to interfere with Ms. Van Vleck's contractual relations and business expectancies.  The "improper means" includes, but is not limited to, conspiring with Ms. Barlow and Ms. Erno of Crowell & Moring to undertake a targeted, unprofessional, harassing, defamatory, retaliatory and unjustified investigation, into false allegations against Ms. Van Vleck, including by defaming Ms. Van Vleck to her colleagues, team, and co-workers by interrogating them about her alleged alcohol abuse, reporting to work inebriated or "disheveled," having sexual relations with subordinates, taking her undergarments off in a public place (to have sex with men in public bathrooms),

dressing and acting inappropriately in the workplace; by impugning her professionalism; by treating Ms. Van Vleck in a hostile manner and differently from the manner in which other employees who had not reported illegal and defamatory conduct by Sallyport's General Counsel, were treated; by attempting to use a photograph of Ms. Van Vleck having a glass of wine with friends on her day off as "proof" that she was skipping work hours, engaging in a sexual relationship with a subordinate, and had a drinking problems; by issuing a false "finding" as a result of the unjustified investigation and requiring Ms. Van Vleck to have an executive coach while Mr. Rathbun and Ms. Chauhan were not subjected to any adverse action; by placing Ms. Van Vleck on administrative leave unless she agreed to unreasonable demands to return to work, including handwritten apologies to her harassers and dropping her legal claims; and eventually, by terminating Ms. Van Vleck because she would not drop her complaints and continued to insist they be investigated.

186.   Defendants' improper interference was intended to, and did, create a work environment where Ms. Van Vleck was barred from advancement and further opportunities with Sallyport and Caliburn, since the result of the conduct by Defendants was that Ms. Van Vleck was no longer a credible leader, with her reputation irreparably damaged.

187.   But for the improper interference of Defendants as set forth above, Ms. Van Vleck would continue to enjoy continued employment with Sallyport and Caliburn, and would continue to realize the business expectancies as set forth in this Complaint.

188.   Mr. Rathbun, Ms. Chauhan, and Mr. Van Dusen held personal motivations for their conduct against Ms. Van Vleck, namely to protect their own careers and to hide the fact that they each took steps to illegally retaliate against her in order to do so, and their conduct was discriminatory and retaliatory, which constitute improper motives.

189.     These actions taken by Mr. Rathbun, Ms. Chauhan, and Mr. Van Dusen were intentional, and evinced ill will, recklessness, and willful disregard of Ms. Van Vleck's rights, as well as wantonness, oppressiveness, maliciousness, a spirit of mischief, and a conscious disregard for the rights of Ms. Van Vleck, and did not further any legitimate business interest of Ms. Van Vleck.

190.     As a direct and proximate result of Defendants' actions, Ms. Van Vleck has suffered, and will in the future suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, stress, panic attack, embarrassment, humiliation, stomach pains, insomnia, headaches, exhaustion, depression, anxiety, a sense of betrayal, isolation and profound injustice, damage to her reputation, fearfulness, loss of enjoyment of life, medical expenses, physical impact, loss of career and business opportunities and advancement, other past pecuniary expenses, future pecuniary losses, and other non pecuniary losses.

191.     Due to the severity of Defendants' willful misconduct and malice, Plaintiff is also entitled to punitive damages.

## COUNT FIVE –
## COMMON LAW CONSPIRACY
### (against Robert Rathbun and Sarita Chauhan)

192.     The foregoing allegations are incorporated as if realleged herein.

193.     Mr. Rathbun and Ms. Chauhan conspired with each other, and with others, including Ms. Barlow and Ms. Erno, causing financial and emotional distress and loss to Ms. Van Vleck.

194.     Mr. Rathbun and Ms. Chauhan, together with Crowell & Moring, Ms. Barlow and Ms. Erno, conspired to ensure that Ms. Van Vleck would be terminated without any true or legal

justification, all in an effort to discredit her, and to protect Mr. Rathbun, after Ms. Van Vleck

filed a complaint against Mr. Rathbun for making illegal and defamatory statements about her.

Mr. Rathbun and Ms. Chauhan participated in, supported, encouraged and condoned the

harassing and unjustified investigation conducted by Crowell & Moring, Ms. Barlow and Ms.

Erno, which targeted Ms. Van Vleck, instead of Mr. Rathbun, and which intentionally

disseminated false and damaging information about Ms. Van Vleck, and purposely spread false

rumors and information about Ms. Van Vleck by the premeditated and damaging nature of the

questions asked about Ms. Van Vleck to her subordinates and colleagues, designed to discredit

and humiliate her, in order to hide their own complicit concealment of Mr. Rathbun's illegal

conduct, and to protect him.

195.    Mr. Rathbun and Ms. Chauhan all shared the same individual motives for

conspiring to force the termination of Ms. Van Vleck.

196.    Mr. Rathbun and Ms. Chauhan each wanted to protect Mr. Rathbun.  Mr. Rathbun

and Ms. Chauhan shared the additional motive of wanting to be rid of Ms. Van Vleck to hide the

fact that they each took steps to illegally retaliate against her in order to do so.

197.    The improper motives further included the defamation of Ms. Van Vleck, the

unjustified and malicious "investigation," and the conspiracy to create false reasons to terminate

her as a result of her refusal to drop her potential legal claims arising from the retaliatory and

malicious investigation, and her insistence that her original complaint against Mr. Rathbun be

properly investigated.

198.    The acts as described above constituted improper methods.

199.    The conduct of Mr. Rathbun and Ms. Chauhan was for unlawful purposes.

200.    The concerted actions of Mr. Rathbun and Ms. Chauhan were willful, intentional, and malicious, and evinced a conscious disregard for the rights of Ms. Van Vleck, were aimed specifically and maliciously at causing damage to Ms. Van Vleck, and did cause Ms. Van Vleck injury and damage.

201.    As a direct and proximate result of Defendants' actions, Ms. Van Vleck has suffered, and will in the future suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, stress, panic attack, embarrassment, humiliation, stomach pains, insomnia, headaches, exhaustion, depression, anxiety, a sense of betrayal, isolation and profound injustice, damage to her reputation, fearfulness, loss of enjoyment of life, medical expenses, physical impact, loss of career and business opportunities and advancement, other past pecuniary expenses, future pecuniary losses, and other non pecuniary losses.

202.    Due to the severity of the conduct of the named Defendants, Ms. Van Vleck is also entitled to, and requests, punitive damages.

## COUNT SIX -
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (against all Defendants)

203.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

204.    Defendants' conduct was intentional and reckless in that it had the specific purpose of inflicting emotional distress on Ms. Van Vleck, was fully intended, and Defendants knew or should have known, that severe emotion distress would likely result.

205.    Defendants' conduct toward Ms. Van Vleck was outrageous and intolerable, offending generally accepted standards of decency and morality.

206.     The actions and conduct of Defendants, as set forth above, and more specifically in ¶¶ 30-122, and elsewhere, were intentional or reckless in that they had the specific purpose of inflicting emotional distress on Ms. Van Vleck, fully intended their conduct, and knew or should have known that severe emotional distress would likely result.

207.     Sallyport and Caliburn are responsible and liable for the intentional infliction of emotional distress on Ms. Van Vleck by Mr. Rathbun, Ms. Chauhan and Mr. Van Dusen under the doctrine of *respondeat superior*, because such actions were taken while they were employed by Sallyport and/or Caliburn.

208.     Sallyport and Caliburn are responsible and vicariously liable for the intentional and reckless conduct of Mr. Rathbun, Ms. Chauhan, and Mr. Van Dusen, and by Crowell & Moring, Ms. Barlow and Ms. Erno as representatives of or agents of, Sallyport and/or Caliburn, under the doctrine of *respondeat superior*.

209.     As a direct result of Defendants' conduct, Ms. Van Vleck has suffered, and continues to suffer, severe emotional distress with physical manifestations including extreme distress, a panic attack, bouts of crying since she learned of the nature of the investigation, nausea, anxiety, insomnia, feelings of helplessness and hopelessness, and loss of self-worth.  She was, and is, embarrassed, humiliated, degraded, and horrified by the nature of the questions her co-workers were asked about her by Defendants.  It was extremely difficult for Ms. Van Vleck to continue to move on and interact with her colleagues and team as if nothing had happened, knowing what they had heard about her, and wondering what they believed about her.  Her ability to lead her team, and effectively coordinate and communicate with them, was been severely undermined.  Ms. Van Vleck could not help but feel that her co-workers are talking about her behind her back, as a result of the false accusation, but even more so because of the

inappropriate nature of the questions asked about her by Ms. Barlow and Mr. Erno, at the behest of and upon direction given by, Sallyport.  Even on her personal time, Ms. Van Vleck constantly looked over her shoulder to be sure she was not being photographed.

210.    As a result of Defendants' conduct and treatment, Ms. Van Vleck also experienced massive chest pains, uncontrollable crying, and blood pressure so high as to place her in danger of having a stroke.  Ms. Van Vleck sought immediate treatment for these symptoms at an urgent care center.  Ms. Van Vleck continued to take medication to cope with her anxiety.  Defendants' comments and actions served to permanently damage Ms. Van Vleck's reputation in the eyes of her subordinates and colleagues, and others in the profession and to prevent Ms. Van Vleck from obtaining other employment

211.    As described above, this conduct by Defendants was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregards for the rights of Ms. Van Vleck.

212.    As a direct and proximate result of Defendants' actions, Ms. Van Vleck has suffered, and will in the future suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, stress, panic attack, embarrassment, humiliation, stomach pains, insomnia, headaches, exhaustion, depression, anxiety, a sense of betrayal, isolation and profound injustice, damage to her reputation, fearfulness, loss of enjoyment of life, medical expenses, physical impact, loss of career and business opportunities and advancement, other past pecuniary expenses, future pecuniary losses, and other non pecuniary losses.

213.    Ms. Van Vleck also sustained pecuniary loss, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

214.    Due to the severity of Defendants' conduct, Ms. Van Vleck is entitled to, and requests, punitive damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kathryn E. Van Vleck requests that this Court enter judgment in her favor, and against the Defendants, SALLYPORT GLOBAL HOLDINGS, INC., CALIBURN INTERNATIONAL, LLC, JIM VAN DUSEN, ROBERT RATHBUN and SARITA CHAUHAN, jointly and severally, on the above counts as applicable to each, and further:

(a)    Award Ms. Van Vleck compensatory damages, plus demonstrated past and future pecuniary damages on each of the above-stated Counts One through Six in amounts to be determined by a jury; and in addition

(b)    Award Ms. Van Vleck punitive and exemplary damages on Counts One through Six, in a total amount not to exceed $350,000 per Defendant (the statutory cap in Virginia); and in addition

(c)    Award Ms. Van Vleck her costs, including but not limited to reasonable attorneys' fees and any expert witness fees, and in addition

(d)    Award injunctive relief consisting of an order prohibiting Defendants from engaging in further employment practices that create or tolerate a hostile, discriminatory or retaliatory work environment; and in addition

(e)    Award Ms. Van Vleck such other and further relief as may be appropriate.

**PLAINTIFF KATHRYN E. VAN VLECK DEMANDS A TRIAL BY JURY.**

January 15, 2019                                    Respectfully submitted,

*/S/ ELAINE CHARLSON BREDEHOFT*
Elaine Charlson Bredehoft, VSB 23766
Adam S. Nadelhaft, VSB 91714
Hans H. Chen, VSB 75691
CHARLSON BREDEHOFT COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
ebredehoft@cbcblaw.com
anadelhaft@cbcblaw.com
hchen@cbcblaw.com
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Kathryn E. Van Vleck*